**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**v.**                              **Case No. 4:14-cv-00757-KGB**

**$328,910.00 IN U.S. CURRENCY**                                               **DEFENDANT**

**WILLIE LEE**                                                                  **CLAIMANT**

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

This matter came before the Court for a bench trial.[1]  Plaintiff, the United States of America ("the Government"), was represented by counsel, and claimant Willie Lee was represented by counsel.  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings and conclusions:

    **I.**    **Findings Of Fact**

    1.    According to Mr. Lee's answer of defendants and verified claim of claimant, this case was initially filed in Pope County, Arkansas, Circuit Court as a state forfeiture case (Dkt. No. 3, ¶ 13).

    2.    On December 29, 2014, the Government filed a verified complaint *in rem* in this Court as a civil forfeiture action pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983 *et seq*., against defendants a 2001 Honda Accord, VIN

---

[1]  Prior to the bench trial, the Government filed a motion *in limine* to exclude argument regarding the contamination of the money supply (Dkt. No. 29).  The Court ruled on this matter at the start of the bench trial.  The Court ruled that Mr. Lee's counsel could cross-examine the Government's witnesses on this issue but reserved ruling on the admissibility of any studies or articles regarding the contamination of the money supply.  Mr. Lee did not offer into evidence at the bench trial any studies or articles regarding the contamination of the money supply.  Therefore, at this point, the Court denies as moot the Government's motion *in limine* (Dkt. No. 29).

1HGCG16581A028210 ("the Honda Accord"), and $328,910.00 in United States currency ("the defendant currency") (Dkt. No. 1).

3.      Mr. Lee filed an answer and verified claim of claimant, asserting a property interest in the Honda Accord and the defendant currency (Dkt. No. 3).

4.      In an Order dated May 9, 2018, the Court dismissed without prejudice the Honda Accord from this case (Dkt. No. 20).

### A.      Car Carrier Stop By Sergeant Chris Goodman

5.      On February 26, 2014, Sergeant Chris Goodman, then a corporal with the Arkansas State Police, pulled over a car carrier in Pope County for improper lane usage.

6.      According to Sergeant Goodman, before he pulled the car carrier over, he ran the license plate of the last car on the car carrier, which was the Honda Accord.  Sergeant Goodman testified that he learned that the Honda Accord was registered to Willie Lee and Andrew Jordan (also known as Peter Morris and John Stephen Garner), both from Little Rock, Arkansas.

7.      After pulling over the car carrier, Sergeant Goodman approached the driver, Batkhishig Lkhaijav, told Mr. Lkhaijav who he was and why he pulled the car carrier over, and asked Mr. Lkhaijav for his driver's license, log book, and the bills of lading for the cars on the car carrier.  The parties do not dispute that Mr. Lkhaijav is the owner of Taisa Transport, LLC, which owned the car carrier and had been hired to transport the Honda Accord from Little Rock to Los Angeles, California (Dkt. No. 32, at 1; Government's Proposed Findings of Fact and Conclusions of Law,[2] ¶¶ 1–2).

---

[2] The Government electronically transmitted its proposed findings of fact and conclusions of law to the Court but did not file them of record with the Court.

8.      According to the "Bill of Lading, Vehicle Inspection Report," the Honda Accord was shipped by "Howard," with a Little Rock address, to "Dewitt/Nina Smith," with a Los Angeles address.  Government's Trial Ex. 3.

9.      Sergeant Goodman testified that it was very unusual that the bill of lading for the Honda Accord did not include the name of either of the vehicle's registered owners because the registered owner is almost always either the shipper or receiver of a vehicle.

10.     Sergeant Goodman also testified that he attempted to call the phone numbers listed on the bill of lading for the shipper and receiver.  Sergeant Goodman stated that he made several attempts to contact "Howard" at the number listed on the bill of lading from both his cellular phone and the driver of the car carrier's cellular phone, but was unsuccessful.  Sergeant Goodman estimated that he made the traffic stop and attempted to contact "Howard" within an hour or so after the Honda Accord had been loaded for transport.  After calling the number listed for "Dewitt/Nina Smith," Sergeant Goodman spoke with an individual who said that his middle name was "Dewitt" but that he did not know anything about the Honda Accord and was not expecting a car.

11.     After calling the phone numbers listed on the bill of lading, Sergeant Goodman testified that he was given permission by Mr. Lkhaijav to search the Honda Accord.  Sergeant Goodman found a compartment built into the trunk of the vehicle located behind a large speaker box and, with the assistance of Arkansas State Police Corporal Chase Melder, then a trooper with the Arkansas State Police, was able to access the compartment.  The compartment was screwed down tightly and was difficult to open.

12.     Inside the compartment, Sergeant Goodman found three large cellophane bundles that contained multiple smaller increments of United States currency wrapped in rubber bands, along with a duffle bag.

13.     Sergeant Goodman testified that numbers were written on the outside of the cellophane bundles to indicate the amount of currency in each bundle.  The numbers written on the outside of the cellophane bundles were:  "100," "85," and "145."  *See* Government's Trial Ex. 13.  According to Sergeant Goodman's testimony, the numbers on the outside of the cellophane bundles suggested that they contained approximately $330,000.00.

14.     Sergeant Goodman also testified that, once the currency was officially counted after being seized, the bundles contained $328,910.00.

15.     Sergeant Goodman also testified that, in searching the Honda Accord's glovebox, he found two Vehicle Registration Certificates issued by the State of Arkansas, one of which was issued and expired in 2013 and the other in 2014, and three Insurance Identification Cards, one of which had an effective date of January 13, 2012, and an expiration date of June 13, 2013; the second had an effective date of July 23, 2013, and an expiration date of January 23, 2014; and the third had an effective date of January 23, 2014, and an expiration date of July 23, 2014.  *See* Government's Trial Exs. 4, 5.  Both Mr. Lee and Andrew Jordan (a.k.a. Peter Morris and John Stephen Garner) are listed on the two Vehicle Registration Certificates.  *See* Government's Trial Ex. 4.  Only Andrew Jordan is listed on the two most recently issued Insurance Identification Cards, and only Mr. Lee is listed on the 2012–13 Insurance Identification Card.  *See* Government's Trial Exs. 4, 5.

16.     Sergeant Goodman also testified that he found two invoices in the Honda Accord's glovebox.  The first invoice was for vehicle maintenance on the Honda Accord that took place on

4

August 13, 2013, by the company Just Tires in Culver City, California.  *See* Government's Trial Ex. 6, at 3601–02.[3]  That invoice was billed to Peter Morris at an address in Los Angeles.  *See* Government's Trial Ex. 6, at 3601.  The second invoice was for vehicle maintenance on the Honda Accord that took place on September 4, 2013, by Just Tires.  *See* Government's Trial Ex. 6, at 3602.  That invoice was also billed to Peter Morris at an address in Los Angeles.  *See* Government's Trial Ex. 6, at 3602.

17.     Sergeant Goodman also testified that, when he asked Mr. Lkhaijav about the currency in the Honda Accord, he did not know that the currency was in the vehicle.  Mr. Lkhaijav picked up the Honda Accord in a Walmart parking lot on Baseline Road in Little Rock from "Howard," who Mr. Lkhaijav described as an African-American male.  Mr. Lkhaijav did not have any additional information regarding the vehicle's shipper.  Mr. Lkhaijav told Sergeant Goodman that he did not recall what the African-American male looked like, and Mr. Lkhaijav was unable to identify him positively in subsequent interviews (Dkt. No. 32, at 1; Government's Proposed Findings of Fact and Conclusions of Law, ¶ 27).

### B.     Events After The Car Carrier Was Stopped

18.     Sergeant Goodman testified that Mr. Lkhaijav signed a form disclaiming knowledge and ownership of the defendant currency.

19.     Sergeant Goodman also testified that he and another officer conducted ion scans on various parts of the Honda Accord after it was seized and impounded.  He further testified that the ion swabs came back positive for the presence of cocaine and heroin.

---

[3] Excepted as otherwise noted, the Court will cite to the Government's Trial Exhibits using Bates numbers.

20.     In response to the Government's requests for admission, Mr. Lee admitted that ion scans conducted on different areas of the Honda Accord tested positive for the presence of narcotics.  *See* Government's Trial Ex. 2, Request for Admission No. 43.  Specifically, Mr. Lee admitted that ion scans were positive for the presence of narcotics in the following areas:  the driver's door handle and panel tested positive for cocaine; the steering wheel tested positive for cocaine and heroin; the gear shift tested positive for cocaine; the middle of the compartment tested positive for cocaine; and the left side of the compartment tested positive for cocaine.  *See* Government's Trial Ex. 2, Request for Admission Nos. 44–48.

21.     According to Corporal Melder, later in the evening of February 26, 2014, he and Sergeant Goodman conducted a dog sniff outside of the Drug Task Force Office with the bundles of currency, which he recorded in the K-9 Search/Find Log.  *See* Government's Trial Ex. 13, at 39.

22.     Corporal Melder testified that Sergeant Goodman put the currency underneath a bucket and placed it on the outside wall of the Drug Task Force Office.  Corporal Melder then deployed Pavatt, his drug dog, along the outside wall.

23.     Corporal Melder also testified that the drug dog alerted to the odor of narcotics coming from the bucket, but the dog did not indicate to the bucket.  According to Corporal Melder, a drug dog's indication is a more profound signal compared to an alert.

24.     Corporal Melder has a certificate for the basic police K-9 course.  *See* Government's Trial Ex. 14, at 40.  He also testified that he has continued to be certified over the years with Pavatt, including the year 2014.  *See* Government's Trial Ex. 14, at 42.

25.     Sergeant Goodman testified that, 11 days after he stopped the car carrier, he went to the address listed on the Vehicle Registration Certificates for the Honda Accord.  Sonja Lee, Mr. Lee's niece, answered the door and talked to Sergeant Goodman.

26.     The Government submitted a transcript of the conversation between Ms. Lee and Sergeant Goodman that occurred on March 9, 2014, based on the video recording taken by Sergeant Goodman.  *See* Government's Trial Ex. 11.

27.     According to the transcript, Mr. Lee lived with Ms. Lee for a time at her home address.  *See* Government's Trial Ex. 11, at 3581.

28.     Ms. Lee explained to Sergeant Goodman that Mr. Lee had been in the Arkansas State Hospital for at least the past four or five months.  *See* Government's Trial Ex. 11, at 3581–82.  Ms. Lee also stated that Mr. Lee had been in either the Arkansas State Hospital or the Pulaski County Jail since May 2013, except that he may have been home for two months out of the entire year.  *See* Government's Trial Ex. 11, at 3582.

29.     Ms. Lee stated that she had never seen a white Honda Accord meeting the description of the vehicle found on the car carrier.  *See* Government's Trial Ex. 11, at 3582.  She also stated that she had not received any papers relating to a Honda Accord at her home address.  *See* Government's Trial Ex. 11, at 3582.  Her address is listed on the Vehicle Registration Certificates and Insurance Identification Cards for the Honda Accord.  *See* Government's Trial Exs. 4, 5.

30.     When Sergeant Goodman asked her on several occasions during the conversation, Ms. Lee repeatedly said that she did not know anyone by the name of "Andrew Jordan."  *See* Government's Trial Ex. 11, at 3582–87.

31.     Sergeant Goodman testified that Ms. Lee did not know about the defendant currency.

### C.     Mr. Lee's Background

32.     Mr. Lee has not been employed for decades, and he does not file taxes. *See* Government's Trial Ex. 1, Stipulation, ¶ 3.

33.     Mr. Lee is a Vietnam veteran who suffers from schizoaffective disorder (Dkt. No. 32, at 1; Government's Proposed Findings of Fact and Conclusions of Law, ¶ 42).

34.     Mr. Lee started receiving disability benefits from the Social Security Administration in June 1977. *See* Government's Trial Ex. 1, ¶ 4.[4]  Mr. Lee received $257,407.20 in disability benefits between the June 1977 start of the benefits payments and the February 2014 seizure of the defendant currency. *See* Government's Trial Ex. 1, ¶ 6.

35.     In his verified claim of claimant, Mr. Lee asserts that he is the owner of the Honda Accord and the defendant currency (Dkt. No. 3, ¶ 2).

36.     Mr. Lee claims that he placed the money he received as Social Security benefits in the Honda Accord and that the vehicle, along with his money, were stolen from him while he was in the Pulaski County Jail and the Arkansas State Hospital (*Id.*,  ¶¶ 4, 9).

37.     Mr. Lee maintains that he was either in the Pulaski County Jail or the Arkansas State Hospital from November 2013 to June 2014 (*Id.*, ¶ 3).

### D.     John Steven Garner's Background

38.     At trial, the Government presented testimony from Lawrence Welborn, currently a detective with the Street Narcotics Unit of the Little Rock Police Department, and formerly a Drug

---

[4]     The parties stipulated that true and accurate records from the Social Security Administration were admitted at the trial of this matter and reflect the full benefits that Mr. Lee received from June 1977 until September 2015. *See* Government's Trial Ex. 1, ¶ 5

Enforcement Administration ("DEA") Task Force Officer on the Tactical Diversion Squad. In 2017, Detective Welborn was assigned to the investigation regarding issues in this case. Detective Welborn testified regarding the identity and background of John Steven Garner, who uses multiple aliases, including Andrew Jordan and Peter Morris.

39.    Detective Welborn testified that he further investigated the Insurance Identification Cards for the Honda Accord, the two most recent of which list Andrew Jordan as the named insured. *See* Government's Trial Exs. 4, 5. Detective Welborn testified that, based on his investigation, he learned that Andrew Jordan has a California driver's license and discovered that Andrew Jordan is also known as John Steven Garner. *See* Government's Trial Exs. 19, 20.

40.    Using this information, Detective Welborn found other driver's licenses that picture the same person under the name of Andrew Jordan and John Steven Garner. *See* Government's Trial Exs. 19, 20.

41.    Detective Welborn testified that he became aware that John Steven Garner was previously married to Mr. Lee's niece, Antecia Lee.

42.    John Steven Garner was arrested in March 2014 in California under the alias "Peter Morris." *See* Government's Trial Ex. 1, ¶ 1.

43.    Detective Welborn further testified that John Steven Garner has recently been indicted in the United States District Court for the Eastern District of Arkansas.

44.    On August 7, 2018, the Grand Jury for the United States District Court for the Eastern District of Arkansas returned an indictment that charges John Steven Garner with one count of conspiracy to possess with intent to distribute cocaine, crack cocaine, and marijuana, five counts of possession with intent to distribute of cocaine, one count of possession with intent to distribute marijuana, one count of possession of a firearm in furtherance of a drug-trafficking

crime, and one count of being a felon in possession of a firearm. *See* Government's Trial Exs. 1, ¶ 2; 21.

45.     The indictment against John Steven Garner dated August 7, 2018, is not related to any conduct from 2014. *See* Government's Trial Ex. 21.

### E.     Other Testimony

46.     At trial, the Government also presented witness testimony from Roby Rhoads, Charles Pittman, Brad Abbott, and Luis Martinez.

#### 1.     Roby Rhoads

47.     Roby Rhoads, currently a captain in the Arkansas State Police, was the training sergeant for the Arkansas State Police and the K-9 coordinator at the time the events in this case occurred.

48.      Captain Rhoads testified that he helped train Pavatt, Corporal Melder's drug dog, before Corporal Melder came to the training. Captain Rhoads trained Pavatt using odor imprinting, taught Pavatt how to indicate to odors, and was responsible for Pavatt's basic obedience and exercise.

49.     According to Captain Rhoads, Pavatt was certified after eight weeks of additional training with Corporal Melder and undergoes additional training periodically. He also testified that Pavatt undergoes testing on a regular basis and is certified every year.

#### 2.     Charles Pittman

50.     Charles Pittman is a financial investigator who works with the DEA. For this case, Mr. Pittman testified that he examined financial records and documents for the purpose of identifying and proving a nexus between drug trafficking and the acquisition of assets, as well as developing facts to support forfeitures and seizures of property.

51.     Mr. Pittman testified during trial regarding Mr. Lee's finances and bank records. According to Mr. Pittman, Mr. Lee's Social Security disability benefits were direct deposited into his bank account.

52.     According to Mr. Pittman, based on his analysis of Mr. Lee's bank records, Mr. Lee did not have any additional income that was payable to his account on a regular basis, other than disability benefits.

53.     Based on his analysis of Mr. Lee's bank accounts, Mr. Pittman testified on direct examination that, after the disability benefits checks were deposited into Mr. Lee's account, smaller amounts were withdrawn in cash but the whole amount was not withdrawn.

54.     In terms of expenses, Mr. Pittman testified that, during the relevant period, Mr. Lee would have had typical living and medical expenses.  Mr. Pittman also testified that, according to Mr. Lee's medical records, Mr. Lee was a user of alcohol and illegal drugs.  *See* Government's Trial Ex. 17, at 284.  Based on Mr. Lee's medical records, Mr. Pittman also included additional costs for Mr. Lee's alcohol and illegal drug addictions in his analysis.

55.     There is a record from the Arkansas State Hospital dated February 18, 1987, which documents information received from Mr. Lee's family.  *See* Government's Trial Exhibit 17, at 237–38.  That record indicates that Mr. Lee's mother suspected that Mr. Lee was using street drugs and alcohol around that time and also reported that, when Mr. Lee received his disability check, he disappeared for several days at a time and then returned home "extremely agitated, confused and behaving in a bizarre manner."  Government's Trial Ex. 17, at 237.

56.     There is record evidence form the Arkansas State Hospital dated August 14, 1987, which indicates that Mr. Lee resided in a boarding house at that time.  *See* Government's Trial Ex. 17, at 288.

57.     Mr. Pittman testified on cross-examination that, when withdrawals were made from Mr. Lee's bank account, only small amounts were withdrawn that were not large enough for payment on a car, rental, or mortgage.  Mr. Pittman further testified on cross-examination that he did not have records of how much Mr. Lee spent on rent or on alcohol and illegal drugs.  Mr. Pittman testified that he did not know how much Mr. Lee paid for medical expenses and acknowledged that Mr. Lee may have received free medical care.

58.     Mr. Pittman also testified that he learned that Mr. Lee had approximately 13 cars over the course of 10 to 15 years.

59.     There is a record from the Arkansas State Hospital that was dictated on December 27, 1982, which states that Mr. Lee eloped from the Arkansas State Hospital on December 3, 1982. *See* Government's Trial Ex. 17, at 218.  He returned on December 4, 1982, and reported that "he left to check on his car and his check.  He said he found out about both, and was ready to return to the hospital."  Government's Trial Ex. 17, at 218

60.     According to Mr. Lee's discharge summaries from the Arkansas State Hospital, dated December 27, 1982, and April 26, 1983, Mr. Lee was told that he should not drive a car anymore because of his visual hallucinations and the medication he was taking.  *See* Government's Trial Ex. 17, at 217–18.

61.     According to Mr. Pittman's testimony on cross-examination, Ms. Lee contributed some money to Mr. Lee, and she has authority to access Mr. Lee's bank account.  Mr. Pittman also testified that, based on the bank account records, he could not determine who made the cash withdrawals from Mr. Lee's account.

### 3.     Brad Abbott

62.     Brad Abbott is a Special Agent with the DEA who investigates criminal activity regarding guns, illegal drugs, and money laundering.  Special Agent Abbott testified that he has been through numerous trainings in basic drug investigation, money laundering, federal law, and complex criminal investigation management, as well as training at the DEA academy.

63.     Special Agent Abbott testified that he has experience in drug-trafficking investigations as a DEA special agent since 2009 and, before that, as a police officer with the North Little Rock, Arkansas, Police Department for nine years, including seven years assigned to the Narcotics Unit and three years as a Task Force Officer with the DEA.  Special Agent Abbott testified that he has used the DEA laboratory for ion scans.

64.     Special Agent Abbott was not the case investigator for the investigation that is the heart of the present case, but he reviewed the case and offered opinions regarding the case.

65.     According to Special Agent Abbott, drug dealers typically send money back to a drug source city, such as Los Angeles.

66.     Special Agent Abbott testified that the street value of a kilogram of cocaine, although dependent on the dealer and the region of the country, is roughly $25,000.00 to $30,000.00, and that the street value of a kilogram of heroin, although dependent on the dealer and the region of the country, is roughly $30,000.00 to $45,000.00 or more.

67.     Special Agent Abbott also testified that the Honda Accord's aftermarket "trap" or compartment in which the defendant currency was found is indicative of drug-trafficking organizations.

68.     Special Agent Abbott testified that drug dealers use car carriers, similar to the one on which the Honda Accord was found, for transportation purposes as a level of protection because the driver of the car carrier can deny knowing what is inside the vehicle.

69.     According to Special Agent Abbott, drug traffickers will often shrink wrap the currency and write numbers on the plastic-wrapped currency to indicate approximately how much money is in the bundle, similar to how the defendant currency was found.

70.     Special Agent Abbott also testified that aftermarket traps built into a vehicle where currency has been found likely, but not always, have been used to transport illegal drugs.  For this reason, the residue of illegal drugs may be found in the trap built into the vehicle.

### 4.     Luis Martinez

71.     Luis Martinez, a Sergeant with the Police Department of Culver City, did not testify live before the Court at trial.  Instead, the Government played a video recording of his deposition and entered his deposition testimony as evidence at trial.  *See* Government's Trial Ex. 23, Dep. of Luis Martinez.

72.     According to Sergeant Martinez's testimony, he arrested Peter Morris (a.k.a. John Steven Garner and Andrew Jordan) on March 4, 2014, in Los Angeles County, California, for conspiracy to purchase 10 kilograms of cocaine.  *See* Government's Trial Ex. 23, at 8, 10.

73.     The arrest came after law enforcement authorities in California received information from a high-level confidential informant that Peter Morris was attempting to arrange the shipment of 10 kilograms of cocaine to Little Rock.  *See* Government's Trial Ex. 23, at 9–10.

74.     Sergeant Martinez further stated that, when he searched Peter Morris' apartment, he found a money counter, rubber bands, the lower half of a 1911 Colt handgun, sifters, a scale, cut or baking soda, sandwich bags, a beaker, and a hot plate.  *See* Government's Trial Ex. 23, at 14–15.  Sergeant Martinez testified that the objects found in Peter Morris' apartment are typically used by street to mid-level dealers to convert powder cocaine to other forms of cocaine.  *See* Government's Trial Ex. 23, at 15.

14

75. Sergeant Martinez also explained that Peter Morris was not charged relating to his March 4, 2014, arrest because law enforcement wanted to continue to use the confidential informant who alerted them to him. *See* Government's Trial Ex. 23, at 17.

## II.  Conclusions Of Law

76. A civil forfeiture action is an *in rem* proceeding brought by the government as plaintiff against defendant property asserting that "[a]ll right, title, and interest in [the defendant] property" has vested in "the United States upon commission of the act giving rise to forfeiture . . . ."  18 U.S.C. § 981(f).

77. The Government seeks forfeiture of the defendant currency pursuant to 21 U.S.C. § 881(a)(6) because the Government contends it constitutes:  (1) currency intended to be furnished in exchange for a controlled substance; (2) proceeds traceable to such an exchange; and (3) currency used and intended to be used to facilitate a violation of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* (Dkt. No. 25, at 6).

78. Mr. Lee argues that he is the owner of all, or at least part of, the defendant currency because it is his savings of benefits payments from the Social Security Administration and was found in a vehicle for which he is one of the registered owners (Dkt. No. 26, at 2).  Further, Mr. Lee maintains that the Government cannot prove that he was involved in any alleged offense giving rise to the forfeiture (*Id.*, at 2–3).

79. The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355(a).

80. The Court has *in rem* personal jurisdiction over the defendant currency pursuant to 28 U.S.C. § 1355(b).

### A.  Standing

81.     Standing, the issue of whether one is entitled to pursue a claim, is an issue in every civil forfeiture lawsuit.  *See United States v. One Lincoln Navigator 1988*, 328 F.3d 1011, 1013 (8th Cir. 2003).

82.     "A forfeiture claimant must satisfy both constitutional and statutory standing requirements to file a verified claim properly."  *United States v. Eleven Million Seventy-One Thousand One Hundred and Eighty-Eight Dollar and Sixty-Four Cents ($11,071,188.64) in U.S. Currency*, No. 4:12-CV-1559 (CEJ), 2014 WL 301014, at *1 (E.D. Mo. Jan. 28, 2014) (quoting *United States v. ADT Sec. Servs., Inc.*, 522 F. App'x 480, 489 (11th Cir. 2013)).

83.     "In order to show standing to contest a forfeiture, one must first show ownership."  *United States v. Ford 250 Pickup 1990*, 980 F.2d 1242, 1246 (8th Cir. 1992) (citing *United States v. One Parcel of Prop. Located at RR 2*, 959 F.2d 101, 103 (8th Cir. 1992)).

84.     "In a typical civil suit, a party's standing to seek redress is most often determined on the pleadings."  *United States v. 1998 BMW "I" Convertible*, 235 F.3d 397, 399 (8th Cir. 2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  "[T]he court construes the allegations contained in the pleadings most favorably to the claimant, according all reasonable inferences in [his] favor."  *Id.* (citing *Tarsney v. O'Keefe*, 225 F.3d 929, 934 (8th Cir. 2000)).

### 1.      Article III Standing

85.     Standing under Article III of the United States Constitution requires that a claimant show an injury in fact, causation by the challenged action, and a judicial remedy.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979), and *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).

86.     "In a forfeiture case, a claimant's Article III standing turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy."  *One Lincoln Navigator 1998*, 328 F.3d at 1013.

87.     "This threshold burden is not rigorous: 'To have standing, a claimant need not prove the underlying merits of the claim. The claimant need only show a colorable interest in the property, redressable, at least in part, by a return of the property.'"  *Id.* (quoting *United States v. Premises Known as 7725 Unity Ave. N.*, 294 F.3d 954, 957 (8th Cir. 2002).

88.     A colorable ownership interest "may be evidenced in a number of ways including showings of actual possession, control, title and financial stake."  *United States v. One 1945 Douglas C-54 (DC-4) Aircraft*, 647 F.2d 864, 866 (8th Cir. 1981) (*Douglas II*).

89.     To determine an ownership interest under Article III, the Court looks to the law of the state where the interest arose.  *See One Lincoln Navigator*, 328 F.3d at 1013 (citing *7725 Unity Ave. N.*, 294 F.3d at 956).

90.     The Honda Accord  was registered and insured in Arkansas at the time of the events giving rise to this action.  *See* Government's Trial Exs. 4, 5.  Therefore, the Court will apply Arkansas law.

91.     The Arkansas Department of Motor Vehicle, upon registering a vehicle, issues a registration certificate and a certificate of title.  *See* Ark. Code Ann. § 27-14-713(a).  Here, the two Vehicle Registration Certificates found in the Honda Accord's glovebox indicate that Mr. Lee and Andrew Jordan (a.k.a. Peter Morris and John Stephen Garner) are the registered owners of the car. *See* Government's Trial Ex. 4.

92.     Mr. Lee's name is on the 2013 and 2014 Vehicle Registration Certificates issued by the State of Arkansas, as well as the 2012–13 Insurance Identification Card, but not the 2013–

14 and 2014 Insurance Identification Cards, for the Honda Acord.  *See* Government's Trial Exs. 4, 5.

93.     According to his verified claim of claimant, Mr. Lee maintains that the defendant currency, which was found in the trunk of a vehicle registered under his name, belongs to him (Dkt. No. 3, ¶ 2).

94.     "[A] claimant that asserts a possessory interest must do more than state that interest in a conclusory fashion."  *United States v. $244,320.00 in U.S. Currency*, 295 F. Supp. 2d 1050, 1061 (S.D. Iowa 2003).  Rather, the claimant needs to provide some explanation of the interest for it to qualify as a colorable possessory interest sufficient to establish standing, and a claimant merely stating that he has a possessory interest is not enough.  *See id.*

95.     Other courts have found that a claimant has constitutional standing in civil forfeiture cases where the claimant has constructive possession of currency that is found in a place owned by the claimant.  *See United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 500 (6th Cir. 1998) (finding that the claimant had standing based on constructive possession of currency found in his own bedroom when he was not present at the time of the seizure); *United States v. $260,242.00 in U.S. Currency*, 919 F.2d 686, 687–88 (11th Cir. 1990) (finding that the claimant "had constructive possession of the money in his trunk, and a possessory interest generally is constitutionally sufficient for claims in forfeiture actions," even though the claimant was not in the vehicle at the time of the seizure (citing *United States v. $38,000.00 in U.S. Currency*, 816 F.2d 1538, 1544 (11th Cir. 1987))).

96.     Mr. Lee received $257,407.20 in Social Security benefits between June 1977 and February 2014.  Mr. Lee asserts that at least $257,407.20 of the defendant currency belongs to him

because it is the money that he saved from his Social Security disability benefits (Dkt. No. 3, ¶¶ 2–5).

97.     Mr. Lee claims that he placed the defendant currency in the Honda Accord before he went to either the Pulaski County Jail or the Arkansas State Hospital between November 2013 and June 2014 (*Id.*, ¶ 3).  Mr. Lee contends that someone stole his Honda Accord, along with his claimed money, during that time period (*Id.*, ¶ 4).

98.     Based on the non-rigorous, threshold requirements of constitutional standing, Mr. Lee has shown that he has at least a colorable ownership interest in some of the defendant currency. For these reasons, Mr. Lee has met his burden to show standing under Article III in this case.  Still, Mr. Lee must satisfy "statutory standing" requirements.

### 2.      Statutory Standing

99.     For statutory standing, the Court looks to Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture ("the Supplemental Rules").  *See United States. v. 5012 N. 6th Street*, No. 4:13CV00498 JLH, 2014 WL 5590555, at *4–5 (E.D. Ark. Nov. 3, 2014).  Under Supplemental Rule G(5)(a):

> (i) A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending. The claim must:
>    (A)  identify the specific property claimed;
>    (B)  identify the claimant and state the claimant's interest in the property;
>    (C)  be signed by the claimant under penalty of perjury; and
>    (D)  be served on the government attorney designated under Rule
>        G(4)(a)(ii)(C) or (b)(ii)(D).

100.    For the purposes of statutory standing, a claimant meets the requirements of Supplemental Rule G "by alleging a sufficient interest in the seized property." *Eleven Million Seventy-One Thousand One Hundred and Eighty-Eight Dollar and Sixty-Four Cents*, 2014 WL

301014, at *1 (quoting *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1273 (10th Cir. 2008)).

101.    "[C]ourts have held that an allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture." *United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 35 (1st Cir. 1999) (citing *United States v. $38,570.00 U.S. Currency*, 950 F.3d 1108, 1113 (5th Cir. 1992)).

102.    In his answer of defendants and verified claim of claimant, Mr. Lee states that "[h]is car was . . . stolen from him when he was in [the Pulaski County Jail] and the [Arkansas State Hospital] when it was on the truck when it was found by the police."  (Dkt. No. 3, ¶ 9).

103.    Mr. Lee also states that, "[b]ecause of his mental disability, he hid his disability money in the car."  (*Id.*).

104.    Mr. Lee asserts that defendant currency "is his life savings as a Vietnam veteran who volunteered for service" and that "[t]his money came from the Social Security Administration because [Mr. Lee] was declared disabled in December 1976 as a result of his service in Vietnam in the Marines."  (*Id.*, ¶ 5).

105.    Mr. Lee states that "[h]e spent almost nothing of his disability checks since then on himself because of his mental illness, which is controlled by medication."  (*Id.*).  Mr. Lee alleges that he "has been cared for financially and generally by his niece Sonya [Lee][5] who has his power of attorney because of his disability . . . ."  (*Id.*, ¶ 6 (citation omitted)).

106.    The Government does not challenge Mr. Lee's compliance with the applicable claim procedures pursuant to Supplemental Rule G(5)(a).

---

[5]  The Government refers to Sonya Lee as "Sonja" Lee.

107.    Based on his answer and verified claim of claimant, Mr. Lee has satisfied the requirements for statutory standing under Supplemental Rule G.

108.    Because Mr. Lee has satisfied both the Article III and statutory standing requirements, the Court concludes that Mr. Lee has standing to maintain his claim.

### B.    Civil Asset Forfeiture Reform Act

109.    Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter" are subject to civil forfeiture.

110.    Under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).

111.    Further, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

112.    "[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture." 18 U.S.C. § 983(c)(2).  In addition, "[c]ircumstantial evidence can be used by the United States to establish its burden of proof." *U.S. v. $84,615.00 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citing *United States v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency*, 258 F.3d 215, 224 n.6 (3d Cir. 2001)).

113.    In a civil forfeiture case, the court considers "the totality of the circumstances, applying common sense considerations." *U.S. v. $48,100.00 in U.S. Currency*, 756 F.3d 650, 653

21

(8th Cir. 2014) (citing *United States v. U.S. Currency, in Amount of $150,660.00*, 980 F.2d 1200,

1206 (8th Cir. 1992)).

114.    "If the government satisfies this burden of proof, then the claimant must prove an

affirmative defense to forfeiture, such as the 'innocent owner defense' codified in 18 U.S.C. §

983(d), or that the forfeiture constitutes an excessive fine."  *United States v. Real Prop. Located

at 3234 Wash. Ave. N.*, 480 F.3d 841, 843 (8th Cir. 2007) (citing *United States v. Dodge Caravan

Grand SE/Sport Van*, 387 F.3d 758, 762–64 (8th Cir. 2004)),

115.    "[F]orfeitures are not favored; they should be enforced only when within both the

letter and spirit of the law."  *United States v. One 1976 Ford F-150 Pick-Up*, 769 F.2d 525, 527

(8th Cir. 1985) (quoting *United States v. One 1936 Model Ford V-8 De Luxe*, 307 U.S. 219, 226

(1939)).

116.    The Government asserts that the defendant currency is drug proceeds and property

that facilitated a violation of the CSA (Dkt. No. 25, at 7).  Specifically, the Government asserts

that the defendant currency is related to a conspiracy for the distribution of a controlled substance,

in violation of 21 U.S.C. §§ 841 and 846 (*Id.*).  The Government contends that the defendant

currency is:  (1) money intended to be furnished in exchange for a controlled substance, (2)

property used or intended to be used to facilitate a violation of the CSA, or (3) proceeds of a drug-

trafficking crime (*Id.*, at 8).

117.    Property facilitates a crime if it makes "the prohibited conduct less difficult or

'more or less free from obstruction or hinderance.'"  *United States v. Premises Known as 3639

2nd St.*, 869 F.2d 1093, 1096 (8th Cir. 1989) (quoting *United States v. One 1977 Mark V Coupe*,

643 F.2d 154, 157 (3d. Cir. 1981)).

118.    Money that an individual receives in exchange for distributing controlled substances is subject to forfeiture as proceeds.  *See Honeycutt v. United States*, 137 S. Ct. 1626, 1631–32 (2017).

## 1.    The Government's Burden Of Proof

119.    The Government has the burden to prove, by a preponderance of the evidence, that the seized property is substantially connected to drug trafficking.  *See* 18 U.S.C. §§ 983(c)(1), (3).

120.    "The government need not prove the seized currency is linked to any particular drug transaction." *$48,100.00 in U. S. Currency*, 756 F.3d at 655 (citing *U.S. Currency, in Amount of $150,660.00*, 980 F.2d at 1205); *see also United States v. Funds in the Amount of One Hundred Thousand and One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018) (determining that a jury instruction "accurately stated the law:  the government was not required to prove the existence of a specific drug transaction.  It is enough that the government showed a connection to *some* transaction—the details are not necessary." (citation omitted)).

121.    The Government need not prove a claimant's culpability for unlawful conduct to obtain a forfeiture; instead, if the Government meets its initial burden of showing, by a preponderance of the evidence, that there was a substantial connection between the property and the offense, it is the claimant's burden to prove his innocence, if he claims the innocent owner defense.  *See* 18 U.S.C. § 983(d)(1).

122.    The Government argues that the defendant currency is linked to John Steven Garner's drug-trafficking activity.  The Government asserts that Peter Morris (a.k.a. John Steven Garner and Andrew Jordan) was arrested in California in March 2014 in connection to drug trafficking, but that he was never charged regarding the March 2014 arrest.  The Government contends that Andrew Jordan brought the Honda Accord to two separate auto mechanic shops in

California five months before the defendant currency was seized.  The Government argues that, based on this evidence, Andrew Jordan was sending the defendant currency in the Honda Accord back to California as payment for illegal drugs.

123.    Mr. Lee argues that the defendant currency is his life savings and that he put the defendant currency in the Honda Accord before going to the Pulaski County Jail and the Arkansas State Hospital in November 2013.

### i.    Applicable Law

124.    The Eighth Circuit Court of Appeals has "adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking."  *United States v. $124,700.00 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) (citing *United States v. $117,920.00 in U.S. Currency*, 413 F.3d 826, 829 (8th Cir. 2005)).

125.    The Eighth Circuit has also recognized that possession of a large amount of currency is strong evidence that the currency is connected with drug activity.  *See $84,615.00 in U.S. Currency*, 379 F.3d at 501–2 (recognizing that possession of a large amount of cash—in that case, nearly $85,000.00 discovered in the claimant's vehicle—"is strong evidence that the cash is connected with drug activity" (citing *U.S. Currency, in Amount of $150,660.00*, 980 F.2d at 1206)).

126.    Drug traffickers commonly wrap currency in plastic wrapping or bags.  *See id.* at 502 (noting that transporting currency in vacuum-sealed bags is a "common ploy to mask odors such as might be detected by dog searches"); *see also United States v. $242,484.00*, 389 F.3d 1149, 1162 (11th Cir. 2004) (stating that wrapping currency in cellophane-type material is a technique used by drug dealers (citing *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 982 (9th Cir. 2002))).

127.    The Eighth Circuit has previously rejected the argument that a drug dog's alert is unreliable because all currency in circulation in the United States is tainted with trace amounts of drug residue.   Although  the Eighth Circuit "has recognized the potential limitations of a drug dog's alert by characterizing it as 'some—albeit slight—indication' of drug activity, [it] still recognize[s] that an alert carries weight in considering whether a substantial connection exists." *United States v. $63,530.00 in U.S. Currency*, 781 F.3d 949, 956 (8th Cir. 2015) (quoting *$84,615.00 in U.S. Currency*, 379 F.3d at 502)).

128.    The Eighth Circuit has held that courts should consider evidence of travel between areas known for drug-trafficking activity to be a relevant factor, and that California is a drug-source state.  *See United States v. Gill*, 513 F.3d 836, 839 (8th Cir. 2008) (crediting testimony from an Iowa State Trooper that California is a drug-source state); *United States v. $141,770.00 in U.S. Currency*, 157 F.3d 600, 604 (8th Cir. 1998) (holding that the forfeiture of currency from a Toyota camper was proper when "the government presented evidence that the camper had originated in California, a drug source state, and was on its way back to California with a very large amount of cash after having spent time in the upper Midwest, a drug destination area" (footnote omitted)); *Cf. United States v. Carrate*, 122 F.3d 666, 669 (8th Cir. 1997) (finding that a state trooper's testimony that the defendant was en route from California, a point of origin for illegal drugs, to Chicago, a common destination for the shipment of drugs, along with other testimony from the trooper, provided the trooper with a reasonable suspicion that the defendant was transporting illegal drugs).

129.    Los Angeles is considered a drug-source city.  *See United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992).

130.    Federal district courts in other circuits have found that hiding currency in non-factory compartments in a vehicle is consistent with the currency being proceeds of drug trafficking. *See United States v. $65,020.00 U.S. Currency*, No. CIV 17-0894 KBM/LF, 2018 WL 5635109, at *5 (D.N.M. Oct. 31, 2018) (finding that currency hidden in one of two non-factory compartments under the vehicle was evidence of drug trafficking); *United States v. $238,500.00 (Two Hundred Thirty-Eight Thousand Five Hundred Dollars) in U.S. Currency*, No. 4:14-CV-03353, 2015 WL 12551092, at *4–6 (S.D. Tex. June 30, 2015) (granting the government's motion for summary judgment where the currency at issue was found in a "hidden compartment," which had been cut into the floorboard, directly under the front passenger seat).

131.    Other courts have observed that drug traffickers will place contraband inside of a car that is loaded onto a transport truck to protect their identity. *See United States v. Cleveland*, 907 F.3d 423, 428 (6th Cir. 2018) (sustaining the defendant's conviction for drug conspiracy and trafficking offenses when the defendant hid 10 kilograms of cocaine inside of a damaged car that was loaded onto a transport truck).

132.    The Eighth Circuit has noted that ion scanning can be used to confirm the presence of illegal drugs in a suspicious bag. *See United States v. Alvarez-Manzo*, 570 F.3d 1070, 1073 (8th Cir. 2009) (discussing a positive ion scan for heroin on the exterior of a bag in the context of an application for a search warrant of the bag); *see also United States v. Reed*, No. 17-253 (MJD/BRT) (D. Minn. July 11, 2018) (noting that a confidential informant's tip was corroborated by a positive ion scan swab, among other factors), *reported and recommendation adopted*, No. CR 17-253 (MJD/BRT), 2018 WL 4232999 (D. Minn. Sept. 5, 2018).

### ii.    Analysis

133.    Based on the totality of the circumstances, the Government has proven, by a preponderance of the evidence, that the defendant currency is substantially connected to drug trafficking.

134.    The defendant currency was found inside the Honda Accord, which was registered to Mr. Lee and Andrew Jordan in 2013 and 2014.  Andrew Jordan was also listed on the 2013 and 2014 Insurance Identification Cards for the Honda Accord.

135.    The defendant currency was found inside an aftermarket trap in the trunk of the Honda Accord by law enforcement.  There is record evidence that these types of compartments are indicative of drug-trafficking organizations.

136.    The defendant currency was bundled and wrapped in plastic with the approximate value of the wrapped currency written on the bundle.  There is record evidence that this type of packaging of money is indicative of drug-trafficking organizations.

137.    The defendant currency totaled $328,910.00, which is a very large amount of cash and strong evidence that the defendant currency was connected to drug activity.  The defendant currency is a much larger amount compared to the amount found by the Eighth Circuit in a prior case to be "an unusually large amount of cash."  *$84,615.00 in U.S. Currency*, 379 F.3d at 501.

138.    Mr. Lee offers no explanation for the difference between the total amount he claims to have received in Social Security disability checks and the amount of the defendant currency—a difference of $71,502.80.  He does not attempt to explain the source of the additional money.

139.    Ion scans on several different parts of the Honda Accord were positive for the presence of narcotics, and Corporal Melder's drug dog made a profound alert to the defendant currency itself.

140.    The Honda Accord, loaded with the defendant currency, was being transported from Little Rock to Los Angeles, a drug-source city.

141.    The Honda Accord was seized from a truck hauler, and the bill of lading for the vehicle did not indicate either of the registered owners.  There is record evidence that drug traffickers often use this method of transportation in an effort to protect their identities.

142.    Attempts to contact the shipper were unsuccessful, and when the intended recipient was contacted, he disclaimed any knowledge of the Honda Accord being shipped to him.

143.    Andrew Jordan (a.k.a. John Steven Garner and Peter Morris) was a registered owner of the Honda Accord and brought it to an auto mechanic shop in Los Angeles for maintenance six months before the vehicle was seized.

144.    Peter Morris (a.k.a. John Steven Garner and Andrew Jordan) was arrested in Los Angeles for conspiracy to purchase 10 kilograms of cocaine only a few days after the Honda Accord was seized.  According to a confidential informant, Peter Morris was attempting to arrange the shipment of 10 kilograms of cocaine to Little Rock.  After Peter Morris was arrested, law enforcement found equipment for drug manufacturing and trafficking in Peter Morris' apartment.  Law enforcement did not charge Peter Morris after this arrest because they wanted to preserve the identity of the informant.

145.    On August 7, 2018, John Steven Garner was indicted in this District for charges relating to drug-trafficking, possession of a firearm in furtherance of a drug-trafficking crime, and felon in possession of a firearm.

146.    Based on the Court's findings of fact and the totality of the circumstances, the Court finds that the Government has met its burden of showing, by a preponderance of the evidence, that the defendant currency is substantially connected to drug trafficking.

### 2.     Mr. Lee's Burden Of Proof

147.     The Court now turns to examine whether Mr. Lee meets his burden to prove an affirmative defense to forfeiture, such as the innocent owner affirmative defense.

### i.     Applicable Law:  Innocent Owner

148.     Under CAFRA, "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).

149.     For a claimant whose ownership interest existed at the time of the illegal conduct, the test is whether the claimant:  "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(d)(2)(A).

150.     Pursuant to CAFRA, an "owner" "means a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest."  21 U.S.C. § 983(d)(6)(A).

151.     However, an owner "does not include . . . a nominee who exercises no dominion or control over the property."  21 U.S.C. § 983(d)(6)(B)(iii); *see also United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1279 (11th Cir. 2010) ("Requiring dominion or control ensures that claimants have at least some actual connection to the property in question; they cannot be only bare title holders.").

152.     "When claimants have Article III standing but fail to prove an ownership interest that meets these statutory criteria . . . Claimants ha[ve] failed to establish on the merits a property interest entitling them to relief."  *One Lincoln Navigator*, 328 F.3d at 1013 (citation and internal quotation marks omitted).

153.   As a claimant, Mr. Lee bears the burden of proving, by a preponderance of the evidence, that he was an innocent owner. *See United States v. One 1989 Jeep Wagoneer*, 976 F.2d 1172, 1174 (8th Cir. 1992).

154.   "The possession of bare legal title to the res may be insufficient to establish ownership." *United States v. One 1945 Douglas C-54 (DC-4) Aircraft*, 604 F.2d 27, 28 (8th Cir. 1979) (*Douglas I*), *appeal after remand*, 647 F.2d 864 (8th Cir. 1981) (*Douglas II*).

155.   "The mere fact that the certificate of [vehicle] registration was issued to [the claimant] does not determine rights of ownership in the [vehicle]." *Douglas II*, 647 F.2d at 866 (quoting *Douglas I*, 604 F.2d at 29).  Rather, a finding of ownership is based on the identity of the individual exercising dominion or control over the vehicle. *See id.* at 866–67.

156.   Under Arkansas law, "the fact that the car was titled in both names is not conclusive of ownership; a certificate of title is only some evidence of ownership, and a vehicle registered to one person may be shown to be owned by another." *Fudge v. Parks*, 574 S.W.3d 723, 730 (Ark. Ct. App. 2019).

157.   If Mr. Lee is an innocent owner with respect to only a portion of the defendant currency, the Court must fashion a partial forfeiture remedy pursuant to 18 U.S.C. § 983(d)(5). *See United States v. 46,000.00 in U.S. Currency*, Case No. 8:04CV170, 2007 WL 1342542, at *6 (D. Neb. May 7, 2007) (citing *One Lincoln Navigator*, 328 F.3d at 1013).

158.   This case is similar to *United States v. $35,890.00 in United States Currency*, No. 8:14CV404, 2016 WL 715779 (D. Neb. Feb. 22, 2016).  In that case, the claimant made a claim of ownership to currency that was seized during a traffic stop of a rental vehicle and seized as suspected proceeds from illegal drug-trafficking activity. *See id.* at *1.  The claimant's brother was a passenger and the claimant himself was not in the vehicle at the time of the stop. *See id.*

The claimant argued that he was an innocent owner of the currency, maintaining that it was a combination of more than two decades of savings, a workers compensation settlement, and a gift from his sister. *See id.* The court held that the claimant failed to meet his burden of showing, by a preponderance of the evidence, that he was an innocent owner of the currency, reasoning that the claimant's story was "implausible and not credible, particularly coming from someone so conscientious about protecting his money . . . ." *Id.* at *5.

159. This case is also similar to *United States v. $34,600.00 in United States Currency*, No. 8:06CV567, 2007 WL 3244081 (D. Neb. Nov. 1, 2007). In that case, state patrol officers seized currency as the result of a traffic stop of a truck tractor and trailer. *See id.* at *1. The truck driver and a passenger both claimed a portion of the currency, which was found hidden behind a panel to the right of the accelerator. *See id.* at *6. Troopers later ran a drug dog by the currency at the Nebraska State Patrol Traffic Office, and the dog indicated to the place in the room where the suspected drug-related money was hidden. *See id.* at *8. The driver was the registered owner of the truck, but the trailer was registered to a company for which neither the driver nor passenger worked. *See id.* at *17–18. Both the driver and the passenger claimed that the money came from their savings and was hidden in the vehicle so that it would not be lost or stolen. *See id.* at *13. The driver also claimed that some of the money in the vacuum-sealed package came from the sale of his restaurant. *See id.* at *11. The court found that, although the claimants had demonstrated an ownership interest, they failed to prove, by a preponderance of the evidence, that they were "innocent owners" of the currency. *Id.* at *17. In so holding, the court noted that the driver did not offer any evidence documenting the sale of the restaurant. *See id.* The Court also doubted the passenger's assertion that he was able to save $18,000.00, mostly in $20.00 bills, from his earnings as a truck driver over two or three years. *See id.*

### ii.    Applicable Law:  Excessive Fine

160.    The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed . . . ."

161.    Under CAFRA, "[t]he claimant . . . may petition the court to determine whether the forfeiture was constitutionally excessive."  18 U.S.C. § 983(g)(1)

162.    "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (citing *Austin v. United States*, 509 U.S. 602, 622–23 (1993), and *Alexander v. United States*, 509 U.S. 544, 559 (1995))).  The Supreme Court has held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.*

163.    The Eighth Circuit applies a two-prong approach to determining if a fine is "grossly disproportional."  *United States v. Dodge Caravan*, 387 F.3d at 763 (citing *Austin*, 509 U.S. at 622–23).  First, the claimant must make "a prima facie showing of gross disproportionality."  *Id.* (quoting *United States v. Premises Known as 6040 Wentworth Ave. S.*, 123 F.3d 685, 688 (8th Cir. 1997)).  Then, "the court considers whether the disproportionality 'reach[es] such a level of excessiveness that [in justice] the punishment is more criminal than the crime.'"  *Id.* (first alteration in original) (quoting *United States v. 6040 Wentworth Ave. S.*, 123 F.3d at 688).

164.    Mr. Lee does not argue that the granting of a forfeiture in this case would constitute an excessive fine in violation of the Eighth Amendment.

### iii.    Analysis

165.    Mr. Lee argues that the defendant currency is his savings from the Social Security disability benefits that he received between June 1977 and February 2014, when the currency was seized by law enforcement.  He argues that he placed the defendant currency in the aftermarket trap in his vehicle and that the vehicle was subsequently stolen while he was in either the Pulaski County Jail or the Arkansas State Hospital.

166.    The Government argues that Mr. Lee cannot prove that he owns the defendant currency because the full amount that he received in disability benefits between June 1977 and February 2014 is $71,502.80 less than the total amount of currency found in the Honda Accord. The Government also contends that Mr. Lee had no other source of income and expenses throughout the last 40 years that he paid for using his disability benefits.

167.    Mr. Lee is a registered owner of and has in the past been a named insured on the insurance policy issued for the Honda Accord.  However, the Honda Accord has already been dismissed from this case.

168.    Even if the Court assumes, for the sake of argument, that Mr. Lee has an ownership interest in the Honda Accord, Mr. Lee's ownership interest in the car does not satisfy the requirement that he prove an ownership interest in the specific property sought to be forfeited, here, the defendant currency.  *See* 21 U.S.C. § 983(d)(6)(A).

169.    Based on the record evidence and trial testimony, the Court finds that Mr. Lee has failed to prove, by a preponderance of the evidence, that he is an innocent owner of the defendant currency, in whole or in part.

170.    Mr. Lee claims that he placed the defendant currency in the Honda Accord before he went to either the Pulaski County Jail or the Arkansas State Hospital between November 2013 and June 2014 (Dkt. No. 3, ¶ 3).

171.    Mr. Lee offers no explanation for the difference between the total amount he claims and the amount of the defendant currency; he does not attempt to explain the source of the additional money.

172.    Between June 1977 and February 2014, Mr. Lee received a total of $257,407.20 in Social Security benefits.   Those funds were deposited directly into Mr. Lee's bank account. According to the testimony of Mr. Pittman, Mr. Lee did not have any other documented forms of income that were payable to his account on a regular basis during that time.

173.    Based on the record before it, weighing all of the evidence and the credibility of the witnesses, the Court does not find credible Mr. Lee's assertion that he saved all $257,407.20 of the disability benefits that he received between June 1977 and February 2014.

174.    In terms of expenses, Mr. Pittman testified that Mr. Lee would have to pay typical living expenses and medical expenses, with additional costs for his alcohol and drug addictions. However, Mr. Pittman testified on cross-examination that he did not have records regarding the amount of money that Mr. Lee spent on rent, medical expenses, alcohol, or illegal drugs.

175.    It is unclear, based on the record, what Mr. Lee's expenses have been since June 1977.  However, the record shows that at least some of the benefits he received were withdrawn shortly after his Social Security benefit checks were deposited.   In addition, Mr. Lee has a documented addiction to alcohol and drugs, and there is record evidence suggesting that he used his benefits to support his addictions at some time.

176.    Even though Mr. Lee received some money from Ms. Lee, there is no indication in the record as to the specific amount of money that he received from Ms. Lee or over what period of time he received that money.

177.     Further, Mr. Lee has not presented any evidence that he withdrew all of the money in his account and put it in the Honda Accord before November 2013, when he went back to either the Pulaski County Jail or the Arkansas State Hospital.  There is no evidence that Mr. Lee ever withdrew the full amount of his Social Security benefits from his bank account to have that amount of cash on hand.  Instead, Mr. Pittman testified that only smaller amounts were withdrawn after the benefit checks were deposited, never the full amount of the benefit checks.

178.     There is also no evidence that Mr. Lee had access to the Honda Accord before he went to the Pulaski County Jail or the Arkansas State Hospital.  On December 4, 2013, Mr. Lee was admitted to the Arkansas State Hospital for a psychiatric evaluation, but the record does not show how long Mr. Lee stayed at the Arkansas State Hospital once he was admitted.  *See* Government's Trial Ex. 17.

179.     According to the transcript of the interview between Sergeant Goodman and Ms. Lee, after the defendant currency was seized, Mr. Lee lived with Ms. Lee for a time at her home address.  *See* Government's Trial Ex. 11, at 3581.  She informed Sergeant Goodman that Mr. Lee lived with her at one point but that he was in and out of the Pulaski County Jail or the Arkansas State Hospital most of the year and since May 2013, except for approximately two months.  *See* Government's Trial Ex. 11, at 3582.

180.     Ms. Lee also explained to Sergeant Goodman that Mr. Lee was in the Arkansas State Hospital for the last four or five months at the time of the interview in late February or early March 2014.  *See* Government's Trial Ex. 11, at 3581–82.

181.     Ms. Lee stated that she had never seen a white Honda Accord meeting the description of the vehicle found on the car carrier; she had no knowledge that Mr. Lee owned the Honda Accord.  *See* Government's Trial Ex. 11, at 3581–84.  She also stated that she had not

received any papers relating to a Honda Accord at her home address.  *See* Government's Trial Ex. 11, at 3581–84.

182.    The vehicle registration for the Honda Accord included Ms. Lee's address.  *See* Government's Trial Ex. 4.

183.    In her conversation with Sergeant Goodman, Ms. Lee repeatedly said that she did not know anyone by the name of "Andrew Jordan."  *See* Government's Trial Ex. 11, at 3581–83. Andrew Jordan is the other registered owner of the Honda Accord.  *See* Government's Trial Ex. 4.

184.    Detective Welborn testified that he became aware that John Steven Garner (a.k.a. Andrew Jordan and Peter Morris) was married to one of Mr. Lee's other nieces, Antecia Lee.

185.    The Honda Accord was in Los Angeles as recently as September 4, 2013, when Peter Morris (a.k.a. John Steven Garner and Andrew Jordan) brought the vehicle in for maintenance.

186.    The Court acknowledges that there is a record from the Arkansas State Hospital that was dictated on December 27, 1982, which states that Mr. Lee eloped from the Arkansas State Hospital on December 3, 1982.  *See* Government's Trial Ex. 17, at 218.  He returned on December 4, 1982, and reported that "he left to check on his car and his check.  He said he found out about both, and was ready to return to the hospital."  Government's Trial Ex. 17, at 218.  That evidence is too remote in time to be persuasive.

187.    Further, the Court acknowledges that Mr. Pittman also testified that he learned Mr. Lee had approximately 13 cars over the course of 10 to 15 years.  Based on the record, it is unclear if Mr. Lee owned the cars or if he made any payments toward a car loan.  The Court concludes that this evidence is not particularly probative of any fact in dispute in this case.

188.    Even though Mr. Lee can show that he has received a total of $257,407.20 in Social Security benefits between June 1977 and February 2014, given all of the other evidence presented in this matter, the Court finds that Mr. Lee has failed to prove, by a preponderance of the evidence, that he is an innocent owner of any portion of the defendant currency.

189.    Mr. Lee's argument that he saved his entire life savings and hid that amount in an aftermarket trap inside the Honda Accord is not supported by the record evidence.  Further, the Court finds this claim not credible based on all of the record evidence presented.

190.    Specifically, the Court finds that Mr. Lee is not an "owner" because he has not established, by a preponderance of the evidence, that he exercised "dominion or control over the property." 21 U.S.C. § 983(d)(6)(B)(iii).

191.    For these reasons, the Court finds that Mr. Lee has failed to prove, by a preponderance of the evidence, that he is a innocent owner of the defendant currency.

192.    Accordingly, the Government is entitled to a judgment of forfeiture.

**III.    Conclusion**

The defendant currency, $328,910.00 in United States currency, shall be forfeited to plaintiff, the United States of America.  The Court denies as moot the Government's motion *in limine* (Dkt. No. 29).  Judgment will be entered accordingly by separate order.

It is so ordered this 21st day of April, 2020.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge